## Case No. 822.

### The BALTIC.

### [2 Ben. 396.] [1]

District Court, S. D. New York. May, 1868.

COLLISION IN EAST RIVER—FOG—SPEED—UNLAWFUL ANCHORAGE.

1. Where a brig lying at anchor in the East river, within the distance of sixty yards from a direct line between the landing places of one of the ferries, was run into by a ferry-boat in a fog in the early morning, the ferry-boat having previously made five trips on the ferry that morning, on which trips the light of the brig had been seen, and she had been avoided, and, on the trip in question, the ferry-boat, after starting from her slip, slowed to half speed, and ran on, looking for the brig, and, not seeing her, stopped her engine, and afterward started ahead again, and, as soon as she got way on her, shut off to half speed, and ran so till she sighted the brig at a distance of not over twenty yards, but, not being able to stop in less than thirty yards, was not then able to avoid a collision: *Held*, that the ferry-boat was in fault in going at too great speed, and that such fault contributed to the collision.

2. That the brig was violating an ordinance of New York city in lying where she was, and that such violation was a fault contributing to the collision.

[Followed in Brush v. The Plainfield, Case No. 2,058.]

3. That, both vessels being in fault, the damages must be apportioned.

[In admiralty. Libel by Baron de Livremento against the ferry-boat Baltic for collision. Decree for libellant.]

G. A. Forster, for libellant.
B. D. Silliman, for claimants.

BLATCHFORD, District Judge. This is a libel for a collision, filed by Baron de Livre-

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

mento, the owner of the Brazilian brig Palma against the steam ferry-boat Baltic. The collision happened on the morning of the 14th of December, 1863, a few minutes after a quarter past six o'clock. The brig was lying at anchor in the East river, near the ferry-boat's slip, at the foot of Atlantic street, in Brooklyn. The ferry-boat plied regularly from the foot of Whitehall street, New York, to her slip at Brooklyn. She had been running on the morning in question since five o'clock, having left Brooklyn at that hour. The trip from one side to the other usually occupied six or seven minutes. She left Brooklyn again at half past five o'clock, and again at six o'clock. She left New York at a quarter past five o'clock, at a quarter before six o'clock, and at a quarter past six o'clock. The collision happened on the last-named trip. She had, therefore, made five trips on that morning before the trip on which the collision happened. On each of those trips she had passed the brig in safety. At the time of the collision, the tide was flood, and the Palma was heading to the southward and westward. There was a very thick and heavy fog at the time, it having been foggy since the previous afternoon, and very thick since before five o'clock. The Palma had anchored where she was on the previous afternoon, and had not shifted her position at all from the time she anchored, except as she swung with the changes of the tide. The ferry-boat struck the Palma, the starboard bow of the ferry-boat coming in contact with the starboard quarter of the Palma, and causing considerable damage. The pilot of the ferry-boat knew that the Palma was anchored there, and had seen her there at anchor on the previous afternoon. On the morning in question he had passed, on his trips, sometimes ahead of her, and sometimes astern of her, as she lay in the tide, and had made her light. On the five previous trips the tide was ebb, and the Palma headed to the north. On the collision trip, the tide was flood, and the Palma headed the other way. The Palma had a light in her rigging during the five trips of the ferry-boat, on that morning, prior to the trip on which the collision took place. This light the ferry-boat had looked for and made, and was guided by, on those five trips. Whether the light on the Palma continued to burn on the trip when the ferry-boat struck her, is disputed on the evidence. The ferry-boat, having left New York on such trip, slowed her engine down to what is called half speed, by shutting off, soon after leaving her slip on the New York side, and kept blowing her steam whistle every few seconds. She was looking for the brig. Not seeing her, she stopped her engine, and afterwards started ahead again, and, as soon as she got way on, shut off to half speed, and ran so till she sighted the brig, at a distance of not over twenty yards off. The engine of the ferry-boat was then stopped and reversed as quick-

ly as possible, and her helm was starboarded, so as to throw her bow up the river with the flood tide. This was a proper manoeuvre, and caused the blow to be a glancing one, and comparatively light. The evidence is, that the ferry-boat, while running shut off, could stop her headway entirely in thirty yards, and that, if she had sighted the brig at a greater distance off than thirty yards, she would not have hit her.

It is impossible not to hold, on these facts, that the ferry-boat was in fault in going at too great speed in the fog, and that such fault contributed to the collision. Although the brig may have been in fault in anchoring where she was, and in not showing a light at the time of the collision, still such fault of the brig, although it partly led to the collision, cannot excuse the fault of the ferry-boat in not running at a sufficiently moderate speed in the fog to avoid the brig. She knew the position of the brig, and, although the brig had been anchored there since the previous afternoon, no notice to the brig to move her position is proved, and the ferry-boat seems to have been content to leave her there and to take the risk of hitting her, although it had been foggy from soon after she anchored, the fog increasing to the time of the collision. Having taken that risk, one element of it was, that the light on the brig, which was exhibited on the five trips, might cease to burn on the sixth. This view proceeds on the assumption that the brig did not have a light. Whether she did or not, I do not deem it necessary to find, for I am satisfied, on the evidence, that the brig was lying in a forbidden place. She was violating the ordinance of the city of New York (section 14, art. 2, c. 26, p. 291, Rev. Ord. 1859) which provides, that no vessel shall lie at anchor in the East river within the distance of sixty yards from a direct line between the landing places of either of the public ferries across the river. This ordinance was binding on the brig, and her violation of it was a fault. The Bedford, [Case No. 1,216;] The James Gray v. The John Fraser, 21 How. [62 U. S.] 187-189. Such violation contributed to the collision.

This case is in all its material features substantially like the case of The Bedford. There must be a decree apportioning equally between the two vessels the damages caused to the libellant by the collision, such damages to be ascertained by a reference.